504 F.2d 203
 164 U.S.App.D.C. 134
 RHODE ISLAND CONSUMERS' COUNCIL AND DIVISION OF PUBLIC
UTILITIES AND CARRIERS OF the STATE OF RHODE
ISLAND, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Algonquin Gas
Transmission Co. et al., Intervenors.
BOSTON GAS COMPANY et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Texas Eastern
Transmission Corporation et al., Intervenors.
MUNICIPAL DEFENSE GROUP, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Arkansas-Missouri
Power Co. et al., Intervenors.
CONNECTICUT PUBLIC UTILITIES COMMISSION, Petitioner
v.
FEDERAL POWER COMMISSION, Respondent, Arkansas-Missouri
Power Co. et al., Intervenors.
 Nos. 73-1159, 73-1223, 73-1292 and 73-1337.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 6, 1974.
Decided Aug. 28, 1974.
 
 Dennis J. Roberts, II, Providence, R.I., I., for petitioners in No. 73-1159.
 John S. Schmid, Washington, D.C., with whom John W. Glendening, Jr., Washington, D.C., was on the brief for petitioners in No. 73-1223.
 William T. Miller, Washington, D.C., with whom Charles F. Wheatley, Jr., Washington, D.C., was on the brief for petitioners in No. 73-1292.
 John H. Burnes, Atty., Federal Power Commission with whom Leo E. Forquer, Gen. Counsel and George W. McHenry, Jr., Sol., Federal Power Commission, were on the brief for respondent.
 
 
 1
 J. Evans Attwell, Houston, Tex., was on the brief, for intervenor Texas Eastern Transmission Corporation.
 
 
 2
 Robert K. Killian, Atty. Gen., for the State of Connecticut, Richard L. Barger, and F. D. Neusner, Asst. Attys. Gen., were on the brief for petitioner in No. 73-1337.
 
 
 3
 Charles E. McGee, John T. Ketcham and Robert J. Haggerty, Washington, D.C., were on the brief for intervenor Algonquin Gas Transmission Company.
 
 
 4
 Richard M. Merriman, J. Richard Tiano and Peyton G. Bowman, III, Washington, D.C., entered appearances for intervenors Arkansas-Missouri Power Company and Associated Natural Gas Company.
 
 
 5
 George J. Meiburger and Platt W. Davis, III, Washington, D.C., entered appearances for Texas Gas Transmission Corporation.
 
 
 6
 Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.
 
 LEVENTHAL, Circuit Judge:
 
 7
 These cases are before the court on petitions to review an order of the Federal Power Commission approving an interim plan for curtailment of natural gas deliveries by Texas Eastern Transmission Corporation, and for certain changes in Texas Eastern's rates. Petitioners include natural gas distributors purchasing gas that flows through Texas Eastern's system, some directly from Texas Eastern and others from Algonquin Gas Transmission Company, a New England pipeline which currently obtains its entire supply from Texas Eastern. Other petitioners are Rhode Island Consumers' Council, the Rhode Island Division of Public Utilities, and the Connecticut Public Utilities Commission. Intervening in support of the Commission's order are Algonquin, Texas Eastern and several large customers of the latter.
 
 
 8
 Petitioners challenge both the allocation and the rate structure changes ordered by the Commission. We decline to pass upon certain objections to the allocation provisions, in view of events that have occurred subsequent to the Commission's order. We do consider the merits of the objections leveled by petitioners against the rate tariff order, particularly the Commission's approval of retention of 'demand charge' provisions notwithstanding termination of entitlement to contract 'demand' quantities. We reject these contentions.
 
 I. PROCEEDINGS BEFORE THE COMMISSION
 
 9
 Taking note of the nation's gas shortage, the Commission on April 15, 1971, issued Order No. 431[1] directing all jurisdictional pipelines to submit reports to implement the FPC's policy that pipelines take all steps necessary to insure an adequate and reliable gas supply for the 1971-72 winter and thereafter. The FPC directed pipelines anticipating curtailment of deliveries to file a tariff sheet, pursuant to 4 and 5 of the Natural Gas Act, setting forth a curtailment plan.
 
 
 10
 Texas Eastern initially responded to Order 431 with a statement that any curtailment necessary would be carried out in accordance with the existing tariff, which called for pro-rata reductions of customers' entitlements under their contracts. Subsequently, on October 19, 1971, Texas Eastern advised the Commission that it would be necessary to curtail deliveries by approximately 15 billion cubic feet during the winter of 1971-72. At the same time, Texas Eastern filed a tariff change eliminating an obligation to refund certain charges when it curtailed deliveries as a result of a supply shortage. The Commission docketed Texas Eastern's tariff change[2] and consolidated further proceedings with those to be held on the delivery curtailment plan. Also joined with the foregoing were proceedings on the curtailment plan and a similar tariff change filed by Algonquin.
 
 
 11
 Following a November 19, 1971, order by the Commission that Texas Eastern should distribute 'evidence in support of the curtailment programs to be pursued' and that the possibility of a settlement should then be explored, the parties commenced negotiations that stretched into the spring of 1972. These culminated in a proposal for an interim curtailment of Texas Eastern deliveries through September 1, 1973; the curtailment plan incorporated the tariff change Texas Eastern had sought by its prior filing.
 
 
 12
 On August 28, 1972, the proposal, which had been drafted by representatives of Texas Eastern and certain Texas Eastern customers, was presented as a nonunanimous settlement proposal to an administrative law judge (ALJ). The proposal was opposed by several parties, including petitioners here. The ALJ rejected requests for an evidentiary hearing concerning the terms of the proposed plan, but did allow Municipal Defense Group (MDG), a petitioner here, to serve Texas Eastern with interrogatories. Following the filing of interrogatories and answers and other documentary materials in support of and opposition to the proposed plan, the ALJ certified the record to the Commission.
 
 
 13
 On December 1, 1972, the Commission approved the proposal as an interim plan for curtailment through September 1, 1973. It turned aside objections by petitioners to the basis for allocation of gas to customers, to the allocated amounts themselves, to the rate structure changes, and to the procedures followed by the ALJ in receiving evidence bearing on the proposal. Petitioners' application for rehearing was denied on January 26, 1973, and this appeal followed.
 
 II. THE ALLOCATION PROVISIONS
 Nature of the Provisions
 
 14
 The plan approved by the Commission provided that each Texas Eastern customer was to receive an annual 'entitlement' (hereinafter 'allocated entitlement') to supersede Texas Eastern's contract commitment to deliver a specified volume of gas. Each customer's allocated entitlement was based initially upon its historical annual purchases of gas from Texas Eastern; upward adjustments from the historical purchase 'baseline' were then made to reflect additional needs of some customers.
 
 
 15
 In the event Texas Eastern's gas supply did not allow it to fill each customer's allocated entitlement, the plan provided that further curtailment of deliveries would be accomplished by ratable reductions in allocated entitlements. Small-volume customers, defined as those with contractual entitlements of 10,000 Mcf per day or less, were exempt from daily curtailment below allocated entitlements (Article III). Under Article IV, other customers were eligible to seek an emergency exemption from daily curtailment to avoid jeopardy to residential and commercial loads.
 
 Challenges to the Allocation Provisions
 
 16
 Petitioners' principal challenges to the allocation provisions may be summarized as follows:
 
 
 17
 1. The Commission's use of historical purchases as the baseline for allocated entitlements was unreasonable in that there was no differentiation among consumptive use of gas, to the detriment of small-volume customers serving highpriority uses of gas;
 
 
 18
 2. The Commission unreasonably refused to guarantee that the exemption from curtailment below allocated entitlements available to small-volume Texas Eastern customers would be extended to Algonquin customers meeting the qualifying criteria; and
 
 
 19
 3. The Commission erred in refusing to require presentation of the settlement proposal by a sponsoring witness, available for cross-examination as to the methods used to calculate individual adjustments to the historical baseline in determining allocated entitlements, an error which led the Commission to approve the proposal on an inadequate record.
 
 
 20
 Decision to Disclaim Resolution of Challenges to Allocation Provisions
 
 
 21
 While some of the petitioners' objections are not without force, the court concludes that, in light of events occurring since the Commission's order, including the expiration of the allocation plan in September, 1973, judicial resolution of challenges to the allocation provisions is now inappropriate. The expiration of the plan, and the accompanying inability to change the allocation of gas to customers, does not alone deprive the court of a 'case or controversy' to adjudicate, for the court is empowered to decide the questions presented if they are likely to recur, and their immediate resolution will serve important public interests.[3] Such a course might be appropriate if petitioners challenged the Commission's power to act, or a basic approach it is likely to follow in future allocation proceedings. But petitioners' objections cannot be so characterized. The Commission's power to mandate allocations, upheld by the Supreme Court in FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), is beyond challenge. And subsequent to the approval in this case of what it stressed was an 'interim curtailment settlement,' thE commission has announced a new approach to permanent curtailment plans. For thr reasons stated below, we conclude that this later permanent approach makes it unlikely that resolution of petitioners' particular objections to Texas Eastern's interim plan would have any significant impact on future allocation proceedings. Accordingly, and in view of our inability to give petitioners meaningful relief even if they should prevail,[4] we decline to resolve petitioners' challenges to the allocation provisions. Such a disposition is analogous to a decision to withhold declaratory relief without reaching the merits, as in A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961), where the Supreme Court stated: 'sound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted.' We now set forth in some detail the considerations underlying our decision to disclaim determination of petitioners' challenges to the allocation plan.
 
 
 22
 Commission Statement of Policy of January 8, 1973
 
 
 23
 Subsequent to its order of December 1, 1972, approving Texas Eastern's interim allocation plan, the Commission issued Order No. 467,[5] dated January 8, 1973, a Statement of Policy, which advised pipelines that the Commission would in the future favor allocation plans that discriminate among end-uses of natural gas with 'high-priority' users protected from curtailment until lower-priority users were without gas entirely. Order 467 contains eight categories of consumptive uses, ranked in the order in which they will be protected from disruption due to shortage.[6] In its order of January 24, 1973, denying petitioners' application for rehearing, the Commission provided that Texas Eastern's filing for a curtailment plan to become effective September 1, 1973, should take into account the policies set forth in Order No. 467, and include detailed submissions so that end-use determinations can be made.
 
 
 24
 While providing that 'in specific cases, opportunity will be afforded interested parties to challenge or support this policy,' Order 467 plainly evinces the Commission's intention to adopt, at least as a point of departure, the approach based upon end-use priorities when reviewing future allocation plans submitted for approval. In its January 24, 1973, order denying rehearing on Texas Eastern's interim curtailment plan, the Commission (at p. 9) drew attention to the newly-promulgated Order 467 and directed Texas Eastern to consider end-use priorities in the preparation of a permanent curtailment plan. More recently, the principle of designating end-use priorities has been reflected in permanent plans approved since promulgation of Order 467. See United Gas Pipe Line Co., 49 FPC 179 (1973), modified, 49 FPC 1211 (1973); El Paso Natural Gas Co., Opinion No. 697, June 14, 1974.
 
 
 25
 Use of Historical Purchases As Baseline for All Customers
 
 
 26
 Petitioners contend that the Commission's use of historical purchases as the baseline for allocated entitlements to all customers constitutes an unreasonable discrimination against small-volume Texas Eastern customers, having a low ratio of historical purchases to contract entitlements but serving end-uses deserving the highest degree of protection from curtailment. The outcome is most egregious, petitioner MDG contends, because the allocated entitlements of industrial customers are boosted by past purchases of gas made on an interruptible basis-- deliveries ordinarily made by a pipeline only when the needs of higher-priority customers have been fully met.
 
 
 27
 We perceive some merit in the contention that an approach that is blind to the differing degrees of hardship disruption of service may impose on different customers may constitute an unreasonable abandonment of reasoned inquiry merely for the sake of a convenient 'rule of thumb.' At the same time, we discern in the provisions for exemption of small-volume customers from daily curtailment below allocated entitlements, and the emergency exemption for others,[7] a sensitivity to special hardships worked by curtailment. In addition, in its order denying rehearing, the Commission addressed MDG's contention that high-priority uses had been given short shrift, stating: 'While it may be true, as MDG contends, that Texas Eastern's larger customers will use part of their allotments for industrial purposes, the record indicates that this is the intent of the smaller customers also.' Finally, the Commission noted that extraordinary relief under 1.7(b) of its rules was available to customers having special hardship.
 
 
 28
 A more currently relevant consideration, however, is that the policy outlined in Order 467 meets the concern which petitioners raise. So long as the Commission continues to focus attention on establishing end-use priorities, there is little prospect of a recurring claim that it has been blinded by historical usage alone.[8] Accordingly, we see no warrant for a declaration as to the validity of the technique employed in Texas Eastern's interim, and now expired, curtailment plan.
 
 
 29
 Refusal to Mandate Exemption for Algonquin Customers
 
 
 30
 Similar considerations govern our treatment of the objection raised by small-volume Algonquin customers to the Commission's refusal to guarantee them the same exemption from curtailment below allocated entitlements that was granted their counterparts purchasing directly from Texas Eastern. The Commission's response to the small-volume Algonquin customers' demands for a guarantee of equal treatment was a statement that Algonquin's allocation should be examined separately, notwithstanding the fact that Algonquin obtains its entire supply from Texas Eastern, in view of the Commission's policy that each pipeline must be 'responsible for its own curtailment plan.'
 
 
 31
 We are concerned about the possibility that a rigid procedure of 'one pipeline at a time' may, as a practical matter, foreclose equal treatment of substantially equal customers, identical except for the fact that some customers purchase directly and others through a major 'customer' pipeline. Refusal to provide for the interests of the indirect purchasers in the initial proceeding raises serious problems, unless justified by overriding considerations of administrative necessity.[9] In Order 467, however, the Commission has acknowledged that discrimination among end-uses requires equal treatment of direct and indirect purchasers having consumptive uses of the same priority, and we read its provisions as eschewing an inflexible rule that truncates the inquiry regardless of the circumstances.
 
 Hearing Procedures and Record
 
 32
 At this juncture we think it appropriate to say that the record in this case is not free from difficulty. The allocated entitlements arrived at in the course of settlement negotiations consisted of historical purchase baselines and individual adjustments to take care of special needs. Municipal Defense Group asserted a need to cross-examine a sponsoring witness to determine the extent of individual adjustments to the baselines and the reasons for making them; the Administrative Law Judge ruled that submission of interrogatories were adequate. We have some doubt that the interrogatory responses filed by Texas Eastern and affidavits in the record sufficiently disclose the basis for individual adjustments to permit a conclusion that the Commission, by its adoption of the settlement proposal, has 'genuinely engaged in reasoned decision-making.' Greater Boston Television Corp. v. FCC, 143 U.S.A.pp.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).
 
 
 33
 It appears, at least upon an initial examination of the record, that the reasons for some adjustments are rather vaguely described as 'to reflect historical purchase patterns,' that there is frequently no identification of controlling factors-- such as nature of end use, the importance of end use to ultimate consumers or to the community at large, or the date of a commitment-- that impelled adjustment, and that adjustments were in some instances made upon data submitted to Texas Eastern and not contained in the record.[10]
 
 
 34
 The difficulties for the reviewing court presented when the record fails to disclose with unmistakable clarity the reasons for the governing provisions of the agency's action are exacerbated where, as here, the terms of its order have originated in proceedings from which some affected parties have been excluded. Compare Mobil Oil Corp. v. FPC, 157 U.S.A.pp.D.C. 235, 483 F.2d 1238 (1973). The Commission's desire for the expedition afforded by settlement proposals, even non-unanimous ones, is understandable, particularly where it is concerned with provisions having a quite temporary life. Nevertheless, the encouragement of settlement agreements gives rise to a complementary obligation to avoid the appearance as well as the reality of special favoritism, by insuring that the basis for action taken is placed on the record for all parties to see.
 
 
 35
 The need for an adequate record is not rigidly tied to particular procedures. Our cases have consistently held that the procedures required are those appropriate to the issues raised. See e.g., American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973). Sua sponte inquiry by the agency may, under certain circumstances, provide the requisite clarity quite as well as the full-dress evidentiary hearing demanded by Municipal Distributors Group here. We do caution, however, that the decision in Pennsylvania Gas & Water Co. v. FPC, 150 U.S.App.D.C. 151, 463 F.2d 1242 (1972), which upheld the Commission's approval of a non-unanimous settlement proposal on a record consisting only of written submissions, is not to be taken as an invitation to dispense with further inquiry whenever the Commission can find some level of descriptive fact at which all parties agree.[11] When important decisions turn on the particular weight to be attributed to certain facts, the Commission may have a duty to probe beyond 'canned' writings or to allow the parties to illuminate the issues through exposure to questioning designed to separate inferences from hard data and ventilate interpretative assumptions.
 
 
 36
 Having identified some difficulties, we decline to determine whether, as petitioners argue, the record and the procedures used to compile it are fatally deficient. Claims such as these will undoubtedly arise again as the Commission approves permanent allocation plans, but they are invariably tied closely to the record and circumstances of the particular case in which they arise. Even if petitioners should prevail, our decision would contribute little in the way of general guidance relevant to future proceedings. Accordingly, it would not be a productive judicial exercise to unravel the record in order to reach the merits.[12]
 
 III. CHANGES IN TEXAS EASTERN'S RATE TARIFFS
 
 37
 The rate change to which petitioners object relieves Texas Eastern of the obligation to refund demand charges when it is unable to meet contractual commitments because of a shortage of its supply. Many, although not all, Texas Eastern customers pay a two-part rate, consisting of a 'demand charge' and a 'commodity charge.' The customer pays a demand charge for the right to demand a specified volume of gas daily; once fixed by the customer's maximum daily entitlement, the charge does not vary with the amount of gas consumed. The separate commodity charge is assessed for each unit of gas delivered to the customer. Prior to the modification here at issue, Texas Eastern's tariff provided for refunding at least a portion of the demand charge when a customer's demand for his entire daily entitlement could not be met.[13] The tariff change approved by the Commission relieves Texas Eastern of this obligation if its failure to deliver is attributable to a supply shortage.[14]
 
 
 38
 Petitioners contend that relieving Texas Eastern of the refund obligation while at the same time permitting it to make deliveries below contractual entitlements is patently unreasonable and contrary to the Natural Gas Act. The reasonableness of the Commission's action must be assessed in light of its economic effects. See Permian Basin Area Rate Cases, 390 U.S. 747, 790-792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). We turn to an assessment of these.
 
 
 39
 The tariff change permits a de facto increase in the average price of gas to any customer paying a demand charge, the amount of the increase dependent upon the amount of gas received and the amount by which gas delivered falls short of a quantity demanded pursuant to the contract. The Commission found that Texas Eastern would not recover its fixed costs at the rates then prevailing so long as a shortage reduced the amount of gas available for sale, and accordingly concluded that the price increase effected by the tariff change was justified in order to mitigate the pipeline's revenue loss. Petitioners do not dispute that the price increase is cost-based,[15] but contend that loss of revenue resulting from supply shortage should be borne by pipeline investors. Petitioners support this contention by referring to decisions of the Commission in past years which identified the risk of a shortfall in supply of gas as a factor justifying increments to the rate of return.
 
 
 40
 Whether a price adjustment ought to be allowed to protect investors involves a 'balancing of the investor and the consumer interests' that is entrusted to the Commission. FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 LEd. 333 (1944). Here the Commission was engaged in an exercise of discretion when it held that the emergency and severity of the shortfall warranted a price increase, a position it maintained with the comment that investors still bore losses of fixed costs ordinarily recovered through a component of the commodity charge, which it was leaving undisturbed. Considerations like these are peculiarly a matter for appraisal by the administrative agency and we do not discern the kind of unreasonableness that would warrant judicial intervention.
 
 
 41
 Petitioners object in broad terms to a 'breach of contract,' but there has been here no unilateral attempt by the pipeline to modify a fixed-price contract with a customer, as was the case in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). In its order denying rehearing the Commission characterized the arrangements between Texas Eastern and its customers as contracts like those considered in United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), agreements to provide service at whatever rates are lawfully in effect under the Natural Gas Act. This characterization has not been contested.
 
 
 42
 The conclusion that the price increase is cost-based does not necessarily dispose of all questions of validity of rates under the Act. To avoid any inference that the court is approving all aspects of the rate schedule, we identify a problem raised by the court at oral argument, whether the Commission's order is not subject to challenge because it distributes the burden of the increase unevenly among Texas Eastern's customers: There is relative advantage (a) for those customers which pay no demand charge, and (b) among the purchasers paying the demand charge, for those who receive substantially their entire contract demands.
 
 
 43
 To determine whether such discriminatory effects of a broadside cancellation of a demand charge refund obligation would be justified is a question we do not reach, because of the petitioners' failure to present it in their objections to the Commission. Section 19(b) of the Natural Gas Act,15 U.S.C. 717r(b), provides, in pertinent part, that
 
 
 44
 no objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.
 
 
 45
 The purpose of this provision is to insure that the Commission has an opportunity to deal with any difficulties presented by its action before the reviewing court intervenes. FPC v. Colorado Interstate Gas Co., 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955). This exhaustion requirement comports with the general function of judicial review to insure that an agency has 'taken a 'hard look' at the salient problems.' Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). The agency cannot reasonably be expected to take a hard look unless the parties participate in the task of identifying the hard problems, and of bringing to light pertinent information and analysis bearing on their resolution. The agency's obligation presupposes a burden on the part of interested parties to draw attention to the consequences of proposed action that adversely affects their interests.
 
 
 46
 The objections to the demand charge that were submitted to the Commission, which parallel those presented to this court on appeal, failed to meet this burden. On appeal, MDG's objections appear in its Brief (p. 48 ff) under the caption: 'It is unlawful to permit Texas Eastern to collect a demand charge for gas it is not delivering.'[16] MDG asserts that the FPC has unlawfully ignored the interests of consumers, an argument highlighted by reference to the circumstance that purchasers must not only bear the higher price of gas to Texas Eastern, but also expend substantial sums for substitute fuel when deliveries are curtailed.[17] Objections like these have a ring of eloquence, but they are, in effect, a contention that the monetary consequences of a shortfall of gas must be borne by the investors. These objections simply do not focus on discriminatory impact of the Commission's action as between different purchasers.[18] It would be contrary to the purpose of 19(b), and the concept of exhaustion of administrative remedies, to accept such a broadside objection as sufficient to alert the Commission to particular and possibly remediable problems. We are precluded by 19(b) from pursuing the discriminatory problem we have identified.
 
 
 47
 For the reasons stated in Part II, supra, we decline to reach the merits as to the allocation provisions of the Commission's order. As to the demand charge provisions, the objections raised by petitioners on the record are rejected[19] and the order is affirmed.
 
 
 48
 So ordered.
 
 
 
 [1]
 The FPC's Order No. 431 ('Order Promulgating Statement of General Policy'), April 15, 1971, promulgated 2.70 under its General Rules, 18 C.F.R., ch. 1, subch. A, Part 2, entitled 'Measures for the Protection of Reliable and Adequate Natural Gas Service,' see 36 Fed.Reg. 7505 (1971)
 
 
 [2]
 The Commission initially suspended the tariff change pursuant to Section 4 of the Natural Gas Act. Subsequently, during the course of the consolidated proceedings, the Commission allowed the change to take effect, subject to Texas Eastern's refund obligation if the change were later disapproved
 
 
 [3]
 See Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); United States v. W. T. Grant Co., 345 U.S. 629, 632-633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (possibility of recurring issue involving same parties, 'together with a public interest in having the legality of the practices settled'); Southern Pacific Terminal Company v. ICC, 219 U.S. 498, 515 (1911) (orders 'capable of repetition, yet evading review'); Friend 388 F.2d 579, 581 (1967) (issue 'continuing and of public importance'); Dyer v. SEC, and of public importance'); Cyer v. SEC, 266 F.2d 33, 46-47 (8th Cir.), cert. denied, 361 U.S. 835, 80 S.Ct. 86, 4 L.Ed.2d 75, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1959). While courts have treated these matters under the single rubric of mootness, e.g., United States v. W. T. Grant Co., supra, it has been suggested that Article III requirements are satisfied by the adversary posture of the litigants and that considerations of recurrence and public importance go to the propriety of remedy. See Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1687-94 (1970)
 
 
 [4]
 There appear to be no related issues on which the validity of the allocation provisions might bear. Petitioners do not allege the existence of any contract remedies, as in Monsanto Co. v. FPC, 149 U.S.App.D.C. 396, 463 F.2d 799 (1972), that might be tied to a determination of the validity of the allocation. And while a determination as to the validity of the allocation might be a prerequisite to resolving a challenge to discriminatory impact of the price structure changes ordered simultaneously by the Commission, no such challenge is before us for the reasons stated in part III of the opinion
 
 
 [5]
 Review of Order No. 467 was sought in this court. It was held to be a non-reviewable statement of policy. Pacific Gas and Electric Co. v. FPC, 164 U.S.App.D.C. , 506 F.2d 33 (1974)
 
 
 [6]
 Order 467-A, 49 FPC 217 (1973), and Order 467-B, 49 FPC 583 (1973), promulgated modifications, not here material, to the priority scheme of Order 467
 
 
 [7]
 Article IV, embodying the exemption, begins 'It is the intent of all parties that residential and commercial loads supplied from Texas Eastern's system be fully protected.' (JA 37)
 
 
 [8]
 Once a purchaser's end-uses have been identified and classified, a question may still arise as to whether its gas 'needs' are more appropriately measured by its contract entitlement or the volume of gas it has historically purchased. The Commission has not used a rigid rule; in some cases it has found contract entitlement appropriate, while in others it has found historical purchase a better indicator of uses which can least withstand disruption. Although the petitioners here have contract entitlements exceeding their historical purchases, this is not always the case; the Commission has on occasion found that customers consistently buying gas in excess of the contractual amount had expectations of continued service warranting protection from the effect of shortage. Compare Ei Paso Natural Gas, supra, Order 697 at 20-21 & 29 with United Gas Pipe Line Co., supra, 49 FPC at 1219. We advert to these findings as illustrative of the point that the reasonableness of a choice between contract entitlement and historical purchases may depend upon the particular circumstances of the case
 Insofar as petitioners object to the use of historical purchases in arriving at their allocated entitlements, an assessment of that claim would require a detailed review of the record, which we decline to undertake for the reasons stated in the last paragraph of Part II of this opinion.
 
 
 [9]
 The Commission may have had in mind such considerations, although their force in this case is diluted by the consolidation of proceedings on curtailment plans for Texas Eastern and Algonquin. The Commission denied a motion by Algonquin to sever proceedings, reasoning that since 'Algonquin's supply will be directly affected by the decision rendered in the Texas Eastern Proceeding. . . . a decision in the Algonquin proceeding could be rendered simultaneously with a decision in the Texas Eastern case.' Order of December 23, 1971, at 3
 
 
 [10]
 These difficulties cannot simply be waived away by the observation that disappointed customers can apply for extraordinary relief if their allocated entitlements are insufficient to cover gas 'needs,' A firm's gas 'needs' are determined, in the final analysis, by application of standards set by the Commission. A gas distributor, and the ultimate consumers he serves, have demands for gas. Failure to meet demands may mean a small annoyance for some users, considerable inconvenience for others, and hardship bordering on catastrophe for still others. It is for the Commission to say what demands are so inflexible that they are treated as 'needs,' and the place where the Commission draws the line can be gleaned only from observations about how it treats firms and consumers. Realistically, a firm or consumer cannot assert its 'needs' without some reference to how the Commission has dealt with other claimants
 
 
 [11]
 More recently in Mobil Oil Corp. v. FPC, supra, the court cautioned that 'the Commission would not be free to adopt factual assertions (such as settlement offers) which had not been subject to examination and testing by opposing parties.' 157 U.S.App.D.C. at 260 n. 93, 483 F.2d at 1263 n. 93
 
 
 [12]
 Petitioners also object to the allocation provisions on the ground that small volume customers should be allowed to qualify for the emergency exemption contained in Article IV as well as the small customer exemption of Article II. Insofar as petitioners assert that they are entitled to the benefit of two provisions designed as alternatives, it appears that they have failed to perceive that the exemptions give relief only from curtailment below allocated entitlements; the entitlements proscribed in Article I are not in any event to be exceeded. Since petitioners' contention turns largely on an interpretation of the plan itself, we decline to pass upon it for the reasons stated above
 
 
 [13]
 The refund was calculated at a rate of 2.7 cents per mcf of the deficiency. Municipal Defense Group brief, p. 49
 
 
 [14]
 Texas Eastern's tariff revision to effect the change, first suspended by the Commission pursuant to 4 of the Act, had taken effect in the course of the consolidated proceedings. The settlement proposal presented to the Commission provided that the refund obligation was to be restored and an adjustment of commodity rates made to allow the pipeline to recoup revenue lost by making refunds. Since Texas Esstern had never made the commodity adjustment proposal in a tariff revision filed under 4, the Commission saw a statutory bar to making commodity rate changes in its December 1, 1972, order in the provision of 5 that the Commission lacks 'power to order any increase in any rate contained in the currently effective schedule . . . on file with the Commission, unless such increase is in accordance with a new schedule filed by (a) natural gas company.' Accordingly, the Commission ordered that Texas Eastern would continue to be relieved of its refund obligation until approval of a commodity rate change proposed by the pipeline
 
 
 [15]
 Although Rhode Island Consumers' Council quarrels with the evidence in support of the Commission's action, its contention is that in view of 'the numerous serious questions raised by sister federal agencies . . . of the bona fides of the gas shortage' the Commission erred in relying upon data submitted by Texas Eastern to establish a shortage of its supply. (R.I. Brief at 15). Evidence in the record showed a consistent gap between acquisitions and contract demands during the period 1969-1970, and more recent deficiencies in Texas Eastern's total supply. (J.A. 1, 235). The Council does not suggest an alternative source of data of greater reliability. We do not disturb the Commission's finding of shortage
 
 
 [16]
 See also MDG Brief at 50: 'It defies all notions of justness and fairness and is contrary to sound public policy to require customers to reimburse the Company for gas not received. The Company-- not the customer-- is the party guilty of breach of contract, and the Company should not be rewarded, and the customer penalized, for the Company's failure to honor its commitments.'
 
 
 [17]
 Boston Gas Brief at 16-17; Brief for Rhode Island Consumers' Council at 15; Brief for Connecticut Public Utilities Commission at 7-8
 
 
 [18]
 Following oral argument, at which the problem of discriminatory impact was identified by questions of counsel, Texas Eastern represented, in a submission filed March 11, 1974, that discriminatory impact was not the subject of an objection before the Commission. Memorandum of Intervenor on New Issues Raised During Oral Argument at 2 n. 2. This assertion has not been challenged by any petitioner. The application for rehearing submitted by MDG, the only such application in the Joint Appendix filed with the court, parallels the argument made in its brief on appeal
 
 
 [19]
 Petitioners' final contention is that the Commission's order is contrary to the Act for its failure to find that Texas Eastern's existing tariff was 'unjust, unreasonable, unduly discriminatory, or preferential.' 15 U.S.C. 717d. A finding that tracks the statutory language is not accepted without scrutiny beyond the words. Similarly, an order is not invalidated by mere failure to use the magic words. A court may reverse for failure to make a statutory finding in haec verba when it is doubtful whether the agency took into account the pertinent standard. We have no doubt here that the FPC was aware that the issue was whether Texas Eastern had shown that the existing tariff was unjust or unreasonable. The FPC should have said so expressly, but in this case we think there was 'harmless error,' not warranting reversal