**PEOPLE'S COUNSEL, Petitioner,**

**v.**

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,**

**Potomac Electric Power Co. and the District of Columbia Department of Transportation, Intervenors.**

**No. 12023.**

District of Columbia Court of Appeals.

Argued Nov. 15, 1977.

Decided Feb. 27, 1979.

Elizabeth A. Noel, Washington, D. C., for People's Counsel.

James T. McManus, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel at the time the case was briefed and argued, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent. Louis P. Robbins, Acting Corp. Counsel, Washington, D. C., also entered an appearance for respondent.

William Dana Shapiro, of the bar of the State of Virginia, pro hac vice, by special leave of court, with whom Alan G. Kirk II, Lawrence A. Gollomp and Allen C. Barringer, Washington, D. C., were on the brief, for intervenor Potomac Elec. Power Co.

Ian D. Volner and Ruth S. Baker, Washington, D. C., entered appearances for intervenor Dept. of Transp.

Before GALLAGHER, NEBEKER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This is a petition for review of three orders of the Public Service Commission (Commission) granting Potomac Electric Power Company (Pepco) an increase in rates for retail electric service in the District of Columbia.[1] It presents for our resolution a narrow issue: whether the Commission erred in refusing to deduct from Pepco's cash-working capital requirement amounts representing accrued taxes and interest on long-term bond indebtedness. We affirm the Commission.

The proceedings below were initiated on December 29, 1975, when Pepco filed an application for authority to increase rates in the District calculated to produce $57,578,-000 in additional revenues. People's Counsel (petitioner) appeared on behalf of the electric consumers of the District of Columbia. D.C.Code 1977 Supp., § 43–205. Formal hearings lasting eleven days were held in June 1976. On October 20, 1976, the Commission issued its Proposed Opinion and Order (Order No. 5831) which granted Pepco an increase in rates calculated to produce $29,411,000 in additional revenues. On November 1, 1976, People's Counsel filed exceptions to the proposed order, citing as error, *inter alia,* the failure of the Commission to offset cash-working capital by accrued taxes and interest. On December 16, 1976, the Commission issued Order No. 5849, which rejected People's Counsel's exceptions. On February 14, 1977, the Com-

mission denied People's Counsel's petition for reconsideration (Order No. 5856). This appeal followed.

I. *Scope of Review*

 Before considering the specific arguments advanced by People's Counsel in this case, we reiterate what often has been stated by this court: the scope of our review of a utility commission's order is narrowly circumscribed. It is limited to questions of law and to findings of fact only if they appear "unreasonable, arbitrary, or capricious." D.C.Code 1973, § 43–706; *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* D.C.App., 330 A.2d 236, 239 (1974); *Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97, 100 (1973). The Commission, not this court, has been entrusted with the primary responsibility of arriving at a fair balance between competing consumer and investor interests. In the *Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968), the Supreme Court delineated the responsibilities of a reviewing court:

First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that

---

1. People's Counsel also was one of two petitioners who challenged the same set of rate orders in *Washington Pub. Interest Organiza-* *tion v. Public Service Comm'n,* D.C.App., 393 A.2d 71 (1978), which raised an issue unrelated to this case.

the Commission has given reasoned consideration to each of the pertinent factors.

■ The burden of petitioner to demonstrate reversible error is considerable. More than a difference of opinion with the Commission must be asserted. Petitioner must establish "clearly and convincingly a fatal flaw in the action taken. . . ." *Goodman v. Public Service Commission, supra* at 101. If the overall impact of the rate order is just and reasonable and produces no arbitrary result, judicial inquiry is at an end. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). We approach petitioner's arguments with these principles in mind.

## II. *Cash-Working Capital*

■ In every ratemaking proceeding, the Commission must determine four fundamentals: (1) what are the utility's gross revenues; (2) what are its operating expenses; (3) what utility property is used to provide the service for which rates are charged (rate base); and (4) what is the appropriate rate of return to be applied to the rate base in order to compute the return to which investors are entitled. I Priest, Principles of Public Utility Regulation 45 (1969). We are concerned on this appeal with only one of the above factors, the rate base, and, of that, a relatively small portion. The Commission authorized, in a rate base of $764,884,000, an allowance for cash-working capital in the amount of $13,401,000—a figure comprising less than 2% of the total rate base. It is petitioner's contention that this amount should have been offset by accrued taxes and interest totalling approximately $12 million, thereby reducing the cash-working capital allowance to slightly over $1 million.[2]

■ There is no disagreement among the parties that an allowance for cash-working capital may be properly included in the rate base.[3] Utilities often experience cash flow problems because they bill for service after it is rendered. It is recognized that customer payments for services generally are not made to the utility until a portion of the cost incurred in furnishing those services is actually paid by the utility. Included, therefore, in the rate base is an allowance for working capital so that the company can keep itself current in paying costs. Cash-working capital represents an amount which the company (investors) must supply from its *own funds* for the purpose of enabling it to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 203 F.2d 494, 498 (3d Cir. 1953). If investors supply the funds for working capital, they are entitled to a return on these advances and this is accomplished by including the working capital requirement in the rate base.

To the extent *customers* provide the revenues to the utility before it pays its costs, however, the investors are not supplying the funds to carry on. If customer-supplied funds are available, they relieve the investor of the necessity for providing them and there is no reason to include in the rate base a cash-working capital allowance. *Al-*

2. During the proceedings below, People's Counsel proposed that the Commission utilize a "balance sheet" approach to compute cash-working capital. This method, if used, would have resulted in a negative cash-working capital allowance of $958,000. The Commission instead employed a "lead-lag" study, the traditional method of computing cash-working capital, which attempts to produce data showing the utility's actual lag between collection of revenue and payment of expenses. On appeal, People's Counsel concedes that the Commission had the discretion to select any reasonable method to compute the cash-working capital requirement. Petitioner thus accepts the lead-lag methodology, but contends the Commission should have recognized as offsets to the amount arrived at by utilization of a lead-lag study, accrued taxes in the amount of $3,366,663 and accrued interest in the amount of $8,743,510. These figures represent the District of Columbia's portion (.4267) of Pepco's system-wide operations.

3. The Commission has allowed Pepco a sum for cash-working capital in the past. *See, e. g., Re Pepco,* 83 P.U.R.3d 113 (1970); *Re Pepco,* 64 P.U.R.3d 364 (1966).

abama-Tennessee Natural Gas Co. v. Federal Power Commission, supra; City of Pittsburgh v. Pennsylvania Public Utility Commission, 370 Pa. 305, 88 A.2d 59 (1952). If the Commission does not make an adjustment in the cash-working capital requirement to reflect the availability of customer-supplied funds, ratepayers would be forced to pay a return on funds which they themselves have advanced. Chesapeake & Potomac Telephone Co. v. Public Service Commission, 201 Md. 170, 93 A.2d 249, 256 (1952).

■ An allowance by the Commission for cash-working capital is not guaranteed as a matter of course. The utility carries the burden of establishing the need for cash-working capital. Application of Wilmington Suburban Water Corp., 203 A.2d 817 (Del.Super.Ct.1964). Absent an abuse of discretion, we may not set aside the amount authorized by the Commission once the utility has borne its burden. Narragansett Electric Co. v. Harsch, 368 A.2d 1194 (R.I. 1977); Idaho Underground Water Users Ass'n v. Idaho Power Co., 89 Idaho 147, 404 P.2d 859 (1965).

As noted previously, at issue are two sources of accrued funds available to Pepco for its own use until the funds are due and payable: accrued taxes and interest. People's Counsel contends that accrued interest on long-term debt is a customer, not investor, source of funds. Because Pepco pays interest on the debt semiannually, it accrues funds, available for its own use, before the date interest must be paid to the bondholders. People's Counsel asserts that since "customer-supplied" interest accruals are available to cover the "gap" between expenses paid and revenue collected, the $13 million cash-working capital allowance should have been offset by an approximately $8 million interest accrual. Both the Commission and Pepco consider accrued bond interest to be funds owned by investors which Pepco cannot be required to advance for day-to-day operations without compensation.

On the other hand, all parties on appeal agree that the cash-working capital requirement must be offset by taxes which have accrued in advance of payment. Rates are specifically calculated to include the tax component. To the extent accruals of taxes are available before their payment, they represent customer-supplied funds on which the investors should not be permitted to earn a return. Cleveland Electric Illuminating Co. v. Public Utilities Commission, 42 Ohio St.2d 403, 330 N.E.2d 1, 16 (1975); State ex rel. Utilities Commission v. Virginia Electric & Power Co., 285 N.C. 398, 206 S.E.2d 283, 297 (1974); Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra, 93 A.2d at 256. The Commission and Pepco do not, therefore, take exception to People's Counsel's position that to the extent tax accruals are generated prior to the actual payment of the tax, the working capital requirement should be reduced. The dispute appears to lie, rather, with the amount of accrued taxes considered by the Commission in this case to be available to Pepco as working funds.

### III. Accrued Interest

The Commission in Order No. 5849 stated:

> [The lead-lag study] does not take into account the lag in payment of accrued interest and dividends, however, because in this Commission's judgment interest and dividends, once accrued, lose their characteristic as customer supplied funds. This judgment, we believe, lies within our discretion to make.

The "lead-lag" study referred to by the Commission is a method of computing cash-working capital which seeks to produce cash flow data showing the actual difference in time between a utility's disbursement and collection of revenue. Traditionally, the lead-lag study used by the Commission has taken into account only the lag in payment of accrued taxes and operating expenses, i. e., costs associated with producing Pepco's regulated service—electricity. Order No. 5849 at 12.[4] The operating expense account

---

4. People's Counsel's recommendation of a so-called "balance sheet" method of computing

cash-working capital simply equates cash-working capital with net current assets, i. e.,

consists of such components as labor and fuel costs, rent and maintenance expenses. According to accounting principles applicable to public utilities, operating expenses are "above-the-line" expenses. Suelflow, Public Utility Accounting: Theory and Application 23–24; Federal Power Commission, *Uniform System of Accounts Prescribed for Public Utilities and Licensees,* 18 C.F.R. 101 (1974).[5] As described by Suelflow, *supra* :

> The above-and-below-the-line concept is explained best by identifying the *line* as that drawn beneath operating expenses in the mechanical process of deducting those expenses from operating revenues. [*Id.* at 24; emphasis in original.]

This point is considered important in ratemaking regulation because it separates capital costs and disallowed expenses from allowed expenses. Above-the-line items, *i. e.,* operating expenses, pertain solely to the supplying of a utility's service. Such items are chargeable to the ratepayers and directly affect the prices paid by the consumer. *Id.* at 23. *See* Priest, *supra* at 47. The legitimacy of placing taxes above the line—and hence regarding them as directly chargeable to customers—is well established. *Galveston Electric Co. v. City of Galveston,* 258 U.S. 388, 399, 42 S.Ct. 351, 66 L.Ed. 678 (1922).

People's Counsel argues that regardless of bond interest being considered a below-the-line item, interest accruals, no less than accruals of taxes or operating expenses, come from the customer and until disbursed (to the bondholders in the case of interest)

should be used as cash working funds. In essence, she contends that the lead-lag study should consider the lag in payment of interest.[6] It is, of course, true that all operating revenue comes, in the first instance, from the ratepayers. But according to the Commission, once received funds are earmarked (accrued) for the payment of bond interest, the company should be allowed a return on the funds. This, it says, is because once operating expenses (including taxes) are deducted from revenues, the amount remaining (operating income) "belongs" to the company. Operating income is, in fact, the compensation to the shareholders and bondholders for the use of their funds, which have taken the form of the utility property. Interest accruals held for semiannual payment to bondholders are an incident of investor ownership and, as presently accounted for, form part of the company's return allowance. *L. S. Ayres & Co. v. Indianapolis Power & Light Co.,* 351 N.E.2d 814, 819 (Ind.Ct.App.1976); *see* J. Bonbright, Principles of Public Utility Rates 149–51 (1961). The Commission concluded that it would not selectively include some below-the-line items in determining cash-working capital while ignoring others.

The People's Counsel's witness proposal [to include interest accruals in determining cash-working capital] has been rejected [because it] selectively includes some non-utility, "below the line" items, *e. g.,* accrued interest and dividends,[7] while excluding non-utility property and miscellaneous deferred debits. In short the

---

current assets minus current liabilities, without regard to above and below the line distinctions (as to the latter, see discussion, *infra* ). Pepco originally proposed (although it later abandoned) utilization of the Federal Power Commission method. This "formula" approach establishes the amount of cash-working capital at one-eighth of the company's annual operating expenses less accrued taxes, if any. Accordingly, it assumes as a rule-of-thumb the necessity for a 45-day supply of cash. Garfield & Lovejoy, Public Utility Economics 71 (1964).

**5.** The Uniform System of Accounts is recognized and enforced by this Commission. *See Re The Chesapeake & Potomac Telephone Co.,*

57 P.U.R.3d 1 (1964). *But compare Washington Pub. Interest Organization v. Public Service Comm'n, supra.*

**6.** This inclusion would reduce the net lag and therefore reduce the amount of cash-working capital, which would in turn reduce the amount of the rate base and ultimately reduce the rate. In essence, the interest accrual would work as an offset to cash-working capital.

**7.** People's Counsel does not argue on appeal that cash-working capital should be offset by accrued dividends.

[People's Counsel's] approach becomes significantly unbalanced. By contrast, the lead-lag study analysis [employed by the Commission] is confined to the Company's utility operations, and affords a precise measurement of working capital needed to support those operations. [Order No. 5849 at 12.]

The Commission concludes that offsets to a utility's cash-working capital should be restricted to accruals of sums to pay operating expenses and taxes.[8]

The Commission's decision to exclude accrued interest from the lead-lag study because it considers such funds as belonging to the investors is not without legal support from other regulatory commissions and courts. To illustrate, the Federal Power Commission has refused to offset working capital by accrued interest. In *Re Florida Gas Transmission Co.*, 93 P.U.R.3d 477, 489 (1972), the FPC stated:

> Interest on long term debt is not a cost-of-service expense but rather a below-the-line item that must be paid out of corporate earnings. As such the funds in these accounts constitute corporate funds which belong unconditionally to the pipeline and the stockholders, and, thus, Florida Gas cannot be required to utilize them without remuneration, as working capital for the benefit of customers. These accruals differ markedly from such items as prepaid purchased gas or *accrued federal income taxes* which are paid by the consumer as part of the rates for the sole purpose of meeting those expenses. [Emphasis added.]

Similarly, in *Re Narragansett Electric Co.*, 1 P.U.R.4th 60, 69 (1973), the Rhode Island Commission refused to accept the consumer advocate's inclusion of accrued interest on long-term debt as a source of cash-working capital.

He overlooks the fact that the allowance for cash working capital is restricted to operation and maintenance expenses and taxes. If interest on long term debt is to be considered as a factor in determining the cash working capital allowance then the related items such as common and preferred dividends . . . should also be considered. Consideration of the one item relating to interest without taking into account the others unduly penalizes the company.

On appeal from this order, the Rhode Island Supreme Court held that it was within the Commission's sound discretion to exclude interest as a source of cash-working capital. *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 322 A.2d 17, 23 (1974). The court accepted the traditional definition of cash-working capital, under which "[t]he source of cash working capital allowances is generally restricted to funds which are allocated for operation and maintenance expenses and taxes. It does not include capital costs." *Id.*

Petitioner, on the other hand, directs attention to the Iowa State Commerce Commission's order in *Re Iowa Power & Light Co.*, 6 P.U.R.4th 446 (1974). That commission adopted, over a dissent, its staff's recommendation that accrued interest on long-term debt be treated similarly to tax accruals. The commission stated that "efforts to distinguish away accrued bond interest as a working capital offset because it is collected in advance of payment as a 'capital cost,' rather than as an 'operating cost,' truly amount to distinctions without a difference." *Id.* at 450.

The Iowa Commission reasoned this way:

> [I]t is said that interest on long-term debt is not a cost-of-service expense. This is

---

**8.** The practical effect of excluding the interest accruals from the lead-lag analysis will be . to give the *shareholders* a return on the *bond* interest during the accrual period. To support the Commission's decision, Pepco urges in its brief that the *bondholders* must be compensated for the use of their interest prior to the time they receive it. While we agree with Pepco that excluding accruals from the analysis will increase the return to *investors,* the *bondhold-* ers will never receive any portion of this increase because they are contractually bound to receive only the interest. Thus, only the shareholders, rather than the bondholders, will receive a return on the accrued bond interest. The issue before us is whether there exists a reason for the Commission's awarding to the shareholders a return on funds paid by ratepayers to the bondholders.

not so. It is the practice of this commission and regulatory agencies across the country to always include interest expense in cost of service. The second premise that as noncost of service funds, the funds collected from the ratepayer to cover bond interest constitute corporate funds belonging to the stockholder, is false by definition, having been based on an erroneous predicate. *The fact of the matter is that these moneys are indeed contributed by the ratepayer and not the stockholder*; and as plainly indicated by our Supreme Court in Davenport Water, *the purpose of a working capital allowance is not to give the stockholder a return on funds not provided by him but rather to assure a fair return on no more than the actual funds contributed by that common stock investor.* [*Id.* at 451; emphasis supplied.]

*Accord, Re Iowa Power & Light Co.,* 20 P.U.R.4th 397 (1977); *Re Iowa Public Service Co.,* 10 P.U.R.4th 467 (1975).[9]

The Iowa opinion convincingly responds to the just stated Rhode Island position. After noting that offsetting working capital by dividends would in no wise aid the company, the Iowa commission states:

A . . . misconception is conveyed through mention of common dividends as a working capital item. The equity owner has no fixed contract right to a return, because his return is derived from funds or earnings remaining after fixed obligations are met. Therefore, he has the right to earn on the full amount of his equity regardless of whether it's retained or paid out. This, however, is not true of accrued interest. *The bondholder receives only his contract interest and no more. If the company were allowed to earn on accrued interest, none of the earnings therefrom would go to the bondholder* upon whose investment the earnings would be made. Accordingly, if accrued interest is not recognized as a source of working capital contributed by the ratepayer and correspondingly offset against any allowance otherwise justified, *the bondholder would receive no extra interest—instead, the stockholder would earn on capital not supplied by him* and receive the previously identified supplemental return or windfall profit. [6 P.U. R.4th at 451–52; emphasis added.]

▮ The well reasoned Iowa opinion, classifying bond interest together with taxes and expenses as fixed obligations,[10] contrasts with the conclusory terms employed by our Commission and the FPC, stating simply that interest, upon accrual, loses its characteristic as a customer supplied fund. In support, the PSC offers no reasoning, but merely asserts, "This judgment, we believe, lies within our discretion to make." On this record, the matter is of insufficient magnitude to merit the unraveling of a complex rate structure solely on this account.[11] As we will later see, we are affirming the order, but in doing so, however, we now direct the Commission's attention to the Iowa commission's opinion, *supra*, for its serious consideration in formulating the rate base in future proceedings.

## IV. *Accrued Taxes*

As we previously noted, the parties agree that taxes are a customer source of capital

---

**9.** We note that at least three other commissions appear to have used accrued interest as an offset to cash-working capital: *Re Continental Tel. Co. of Maine,* 18 P.U.R.4th 636, 643 (1977); *Re Pacific Tel. & Tel. Co.,* 53 P.U.R.3d 513 (1964), *aff'd in part, annulled in part, Pacific Tel. & Tel. Co. v. Public Utilities Comm'n,* 62 Cal.2d 634, 44 Cal.Rptr. 1, 19, 401 P.2d 353, 371 (1965); *Re Michigan Bell Tel. Co.,* 62 P.U.R. (NS) 77, 81 (1945) (company billed subscribers in advance of rendering services, however).

**10.** The Federal Power Commission stated that accrued interest on long term debt, as a below the line item, "[belongs] unconditionally to the pipeline and the stockholders . . . ." *Re Florida Gas Transmission Co., supra* at 489. This statement seems to disregard the fixed nature of an interest obligation. No less than taxes and expenses, the utility is under an obligation to pay the interest on bonds. The interest, therefore, only *conditionally* "belongs" to the utility.

**11.** *But see Washington Pub. Interest Organization v. Public Service Comm'n, supra.*

and must be considered in calculating cash-working capital. The lead-lag study utilized in this case recognizes that there are lags in the payment of certain operating expenses that work in favor of Pepco as well as against it. Since taxes are collected from the ratepayers in advance of their payment, Pepco has customer funds available for its use in covering the gap between the time it must pay expenses incidental to rendering service and the time revenue for that service is received. The record shows that in test year 1975, Pepco enjoyed an 85.7-day delay in the payment of taxes other than federal income taxes. This "positive lag" (or lead) in payments was appropriately recognized by the Commission in its lead-lag study. It utilized a "0" lag for federal income taxes, however, because Pepco was entitled to an approximately $10 million tax refund due to substantial investment tax credit carry-backs. This excess amount of tax liability was carried on Pepco's books throughout 1975 and represented a "negative" accrual or a positive lag in receipts of cash.

People's Counsel contended in the proceedings below and now asserts on appeal that this lag study is deficient in that it failed to account for all accrued taxes, especially federal income taxes. In support of her argument, People's Counsel refers to Pepco's Account 236 which reflects the average of the twelve monthly balances of all taxes accrued during test year 1975 in addition to those accrued in past years, but not paid for any reason. The average amount of accruals represented by this account is $7,890,000.[12] The Commission used in its lead-lag study a detailed time analysis of the accruals of each tax involved, which has the effect of increasing the time lag in payment of expenses while substantially decreasing the net time lag between revenues and expenses. The result is a reduction in Pepco's cash-working capital requirement. This method of accounting for taxes has been used by other commissions. *E. g., Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra.*[13]

As the Commission has demonstrated, if the Commission's treatment of tax accruals is removed from the lead-lag study, the net lag between the payment of expenses and revenues increases. This also causes a corresponding increase in the cash-working capital requirement. If People's Counsel's figure of $7,890,000 were then substituted for the Commission's treatment of taxes and used as an offset, the amount of cash-working capital actually *increases* by $199,767 (D.C. portion). The amount of cash-working capital arrived at by the Commission through its method is, therefore, reasonable. "It is the result reached not the method employed which is controlling." *Federal Power Commission v. Hope Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 287. If the rate order is not unreasonable, we may not reverse even if the method used to reach that result contains "infirmities." *Id.* Under the "end-result" test enunciated by the court in *Federal Power Commission v. Hope Gas Co., supra,* we cannot condemn the Commission's order regarding this issue as unjust or unreasonable in its impact on either the consumers or investors.[14]

*Affirmed.*

12. The District's portion would be $3,366,663.

13. We note that other commissions, to simplify the process, either deduct average tax accruals, *e. g., Re Carolina Power & Light Co.,* 9 P.U.R.4th 129 (1975), or a percentage of the annual tax liability from the cash-working capital requirement. The latter figure may range from 5.5%, *Re Public Service Co. of Indiana,* 17 P.U.R.4th 270, 293 (1976), to 25%, *Re Toledo Edison Co.,* 17 P.U.R.4th 433, 440 (1976), of annual tax liability.

14. Although the result reached is within the range of reasonableness, we think the Commission's use of a zero lag for federal income taxes may be subject to question. It is true that in test year 1975, Pepco effectively experienced a negative federal income tax accrual. There is no indication, however, that this financial position will continue in the future. Pepco will receive the refund. A test year must be representative of future conditions. The Commission is required to make appropriate adjustments to test year results that are unrepresentative to account for changed conditions not reflected in test year data. *City of Evansville v. Southern Indiana Gas & Elec. Co.,* 339 N.E.2d 562, 575 (Ind.Ct.App.1975). In this pro-

ceeding, pro forma adjustments were made to reflect the amount of federal income tax Pepco will be allowed to collect from its ratepayers in years *after* 1975. Since Pepco will be collecting taxes from the ratepayers in future years, we question why similar adjustments were not made in the lead-lag study to reflect the amount Pepco will be expected to have on hand in its accrual account from these collections. The Commission has not answered this question. However, because People's Counsel did not raise the issue of whether the federal income tax accrual account for 1975 reflected unrepresentative test year conditions, and for the reasons we have enunciated, we will not remand for further consideration in this particular instance.