PEOPLE'S COUNSEL OF the DISTRICT
OF COLUMBIA, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF the
DISTRICT OF COLUMBIA,
Respondent.

Potomac Electric Power Company,
Intervenor.

POTOMAC ELECTRIC POWER
COMPANY, Petitioner,

v.

PUBLIC SERVICE COMMISSION,
Respondent.

Nos. 79–1037, 79–1073.

District of Columbia Court of Appeals.

Argued April 9, 1981.

Decided Nov. 30, 1982.

John Schell, Washington, D.C., with whom Brian Lederer and Ralph A. Simmons, Washington, D.C., were on the briefs, for People's Counsel.

Melvin J. Washington, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for Public Service Commission.

William Dana Shapiro, Washington, D.C., with whom Edward A. Caine, Washington, D.C., was on the briefs, for Potomac Electric Power Co.

Before NEBEKER, MACK and PRYOR, Associate Judges.

MACK, Associate Judge:

The Potomac Electric Power Company (hereinafter "Pepco" or "the Company") and the People's Counsel appeal pursuant to D.C.Code 1973, § 43–705, from an order of the Public Service Commission (hereinafter "PSC" or "the Commission") which granted a rate increase to Pepco for retail service in the District of Columbia in Formal Case No. 685. We reject petitioners' claims and affirm the order of the Public Service Commission on all challenged grounds with the exception of the decision to exclude unamortized credit from termination of the Douglas Point plant project from Pepco's rate base. We find that the Commission inadequately articulated the reasons for its decision to allocate all gains from the termination of this project to ratepayers and therefore remand this aspect of Formal Case No. 685 in order to allow the agency to clarify its rationale for this decision.

## PROCEDURAL HISTORY

Pepco filed an application for an increase in retail service rates for District of Columbia customers with the Public Service Commission on July 26, 1977, designated Formal Case No. 685 by the Commission. As later

amended, the application requested a $44.8 million revenue increase based on 1977 test year data. Consumer interests were represented by the Office of People's Counsel, statutory representative of utility consumers pursuant to D.C.Code 1978 Supp., § 43–205, and intervenor status was granted to several other parties who represented various interests. After conducting lengthy hearings and receiving a substantial volume of evidence from the various parties, the Commission concluded hearings and closed the record on May 2, 1978.

Following the close of the record Pepco sought extraordinary relief on several occasions. On December 6, 1978, this court denied a mandamus petition by which Pepco sought to compel the PSC to issue a decision in Formal Case No. 685. On December 21, 1978, Pepco applied to the Commission for a $19.8 million emergency interim rate increase pending the issuance of a final order in Case No. 685.

The Commission issued Proposed Opinion and Order No. 6096 on June 14, 1979 and invited the parties to file exceptions to the findings and conclusions therein. A day later the Commission issued Order No. 6098, granting Pepco an emergency interim rate increase totalling $5,782,000. After reviewing the parties' exceptions to Proposed Order No. 6096 the Commission issued Order No. 7000. Order No. 7000 essentially adopted the proposals outlined in Order No. 6096 and granted Pepco a permanent rate increase of $5,890,000.

Both Pepco and People's Counsel filed Applications for Reconsideration of Order No. 7000. The Commission failed to rule on these filings within 30 days and, therefore, denied them by operation of law. Each party then filed a petition of appeal in this court. Pepco was granted intervenor status in the People's Counsel appeal but People's Counsel's motion to intervene in the Pepco appeal was denied as untimely. On November 7, 1980, we granted the Public Service Commission's motion to consolidate the two appeals.

## ISSUES PRESENTED

The parties appeal the Commission's order on several grounds, which we briefly enumerate here before proceeding to analyze each.

Pepco alleges that the Commission acted arbitrarily and unreasonably in four respects and therefore set rates at levels so low as to be confiscatory. Pepco challenges the Commission's use of 1977 test year data to set rates in 1979, the reduction in the authorized rate of return on its common stock equity, a change in the accounting treatment of funds invested in plant construction, and, finally, the allocation of financial gains realized as a result of the termination of the Douglas Point nuclear power plant project.

People's Counsel argues that the Commission erred in two respects: first, in using the 48% federal corporate tax rate in effect during the test year to determine revenue requirements rather than the 46% rate in effect in 1979 and second, in deciding to exclude accrued interest from cash working capital calculations.

## SCOPE OF REVIEW

It is well established that the scope of this court's review of Public Service Commission orders is very narrow. D.C.Code 1973, § 43–706. See *Washington Gas Light Co. v. Public Service Commission,* D.C.App., 450 A.2d 1187 (1982). It is the Commission, not this court, that must balance the competing interests of utility consumers and investors in the ratemaking process. *People's Counsel v. Public Service Commission,* D.C.App., 399 A.2d 43 (1979). In our review of rate orders

[i]t is especially important to accord great respect to the Commission in a complex, esoteric area such as rate making in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies. Our determination must focus on whether the result reached is arbitrary and appellant bears the burden of clearly demon-

strating arbitrary action. He cannot meet this burden by advancing alternative techniques from which the Commission could have chosen. [*Goodman v. Public Service Commission,* 162 U.S.App. D.C. 74, 78–79, 497 F.2d 661, 665–66 (1974) (footnote and citations omitted).]

■ Petitioners each bear the heavy burden of showing a fatal flaw which renders the Commission's findings and conclusions unreasonable, arbitrary and capricious, a burden not met by merely setting forth an acceptable alternative to Commission action. *Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97, 101 (1973).

■ In reviewing this order our role is to determine whether the overall impact of the rate order is just and reasonable, *People's Counsel v. Public Service Commission, supra,* and to ensure that the Commission "respected procedural requirements, . . . made findings based on substantial evidence, and . . . applied correct legal standards to its substantive deliberations." *Potomac Electric Power Co. v. Public Service Commission,* D.C.App., 402 A.2d 14, 18 (en banc), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) (quoting *Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 342, 362, 415 F.2d 922, 942 (1968)). *See also Washington Gas Light Co., supra.*

We now proceed to analyze the contested components of the Commission's order, since "[i]n any analysis of whether an end result (i.e. the new rate) is not arbitrary, we are aware that . . . the result is but the 'sum of a number of components' . . . . If each component or element is not arbitrary or capricious, the end result will be a sound one." *Goodman v. Public Service Commission, supra* at 79, 497 F.2d at 666 (citations omitted).[1]

## I.

Petitioners each contend that the Commission erred in refusing to consider certain post-test year data. Pepco argues that the Commission arbitrarily ignored post-1977 forecast data that demonstrated the extent and effect of attrition. People's Counsel, on the other hand, argues that the Commission erred in using the 48% federal corporate tax rate in effect during the test year to compute Pepco's revenue requirements rather than the 46% rate in effect when Formal Case No. 685 was decided. "The Commission's interest in using income and expense data from a discrete time period, the test year, and its reluctance continually to extend that period until the issuance of its Final Order, are, we conclude, not unreasonable limitations on the ratemaking process." *Washington Gas Light Co., supra* at 1223. We, therefore, affirm these aspects of the Commission's order.

■ A. We conclude that the Commission did consider Pepco's forecast data in formulating its order and that the final order accounts for attrition in a manner which this court has previously sanctioned. We quote from *Potomac Electric Power Co. v. Public Service Commission, supra,* in which Pepco argued similar claims on appeal:

[T]he most recent available material must be considered and weighed by the Commission in reaching decisions on ratemaking. This is consistent with effective ratemaking policy. If recent operating figures are completely ignored, the new rate will be based on old and perhaps no longer valid data.

The problem becomes more acute when there is a long regulatory lag, as in the instant case where considerable time elapsed between the original request and

---

1. We reject Pepco's contention that we are without jurisdiction to consider the claims raised by People's Counsel on appeal based on the alleged failure of People's Counsel to contest the reasonableness of the rate order as a whole. Our review need not end with a finding that the end result of a rate order is not unreasonable. *See, e.g., Williams v. Washington Metropolitan Area Transit Comm'n, supra; Washington Pub. Interest Organization v. Public Serv. Comm'n,* D.C.App., 393 A.2d 71, 79 (1978), *cert. denied sub nom. Potomac Electric Power Co. v. Public Serv. Comm'n,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).

the final decision. Although this is an inevitable part of the regulatory process where the rights of the company to rate relief must be balanced against the interests of the consumer in a hearing involving a myriad of parties, it is nonetheless important, in fairness to all, that the latest available operating data not be ignored. However, a request to use more recent data submitted in a last minute filing does not present the same situation and is not necessarily a fair or reasonable request. It is to be resolved in the reasonable exercise of the Commission's discretion.... First of all, ... Pepco did not make clear for any reasonable person to understand at the time it filed the new data that it was taking a position that the PSC must adopt a revised test year. Secondly, the Commission in using a 1974 test year did give weight and consideration to the 1975 data filed by Pepco. We would observe that filing the latest available operating data does not necessarily mandate a change in the test year by the Commission. Rather it should select a test year that appears likely to be representative of the future. [402 A.2d at 18–19 (footnotes and citations omitted).]

The Commission followed this mandate in Formal Case No. 685. After finding that "calendar year 1977, as adjusted, is representative of the conditions that can reasonably be expected to exist in the future and, therefore, is an appropriate test period for this proceeding," the Commission agreed to consider the forecast data for the limited purpose of evaluating the effect of attrition, but refused to modify the test year in light of this data. Order No. 6096 at 4–5. After evaluating the forecast data the Commission found that

the record requires a determination that attrition exists. The inflationary economic climate is an obvious cause of Pepco's recent decline in return. The inflationary spiral is anticipated to continue for at least the near future and its effect on Pepco will result in an increase in construction, operating, and financing costs. The projected data ... substanti-

ates that conclusion.... [A]ttrition will persist and should be accounted for in this proceeding. [Id. at 32.]

Based on these findings the Commission accepted Pepco's proposal to use an end of period rate base rather than an average test year rate base to counter the effect of attrition. We have sanctioned this method of countering attrition previously. See Washington Gas Light Co., supra; Potomac Electric Power Co. v. Public Service Commission, supra; Telephone Users Association v. Public Service Commission, D.C. App., 304 A.2d 293 (1973), cert. denied, 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974).

Pepco also claims on appeal that the Commission arbitrarily rejected two other proposals aimed at countering attrition. We disagree, finding that the Commission adequately substantiated these decisions. The PSC rejected Pepco's proposal to increase the rate of return by .25% to account for attrition because the only evidence offered in support of this adjustment was the judgment of Pepco witness Brennan that this was an appropriate measure. The Commission rejected the Company's request for a $9.2 million revenue increase because it was based solely on post-1977 data and approval therefore would have constituted an impermissible change in the test year. Order No. 6096 at 33. Thus, the Commission articulated rational basis for rejecting the Company's proposals.

In summary, we conclude that the Commission properly considered forecast data solely on the issue of attrition, evaluated the measures proposed by Pepco to counter the effect of attrition, and reached a rational decision supported by evidence of record to use an end of period rate base and reject the two other proposals. Pepco has not demonstrated a fatal flaw in the Commission's decision to counter attrition in this manner. See Washington Gas Light Co., supra.

B. The Commission used the 48% federal corporate tax rate in effect during test year

1977 to compute Pepco's revenue requirements. People's Counsel contends on appeal that the PSC arbitrarily refused to recalculate revenue requirements to take into account the 46% rate in effect in 1979 when the rate order in Formal Case No. 685 was issued.

■ People's Counsel cites to regulatory commission decisions which have considered tax law changes in ratemaking even when such changes were effective after the end of the test year (Petitioner's Brief at 9), and argues that the Commission should have judicially noticed the tax law change. Acknowledging that other utility commissions may treat tax law changes differently, we find that the PSC did not act arbitrarily here. The Commission's treatment of the tax law change is consistent with its refusal to open the record to recognize other changes to test year data,[2] and we therefore find no abuse of discretion. *Washington Gas Light Co., supra* at 1223.

## II.

Pepco challenges the Commission's decision to change its accounting treatment of funds invested in plant under construction as arbitrary and unreasonable.

The Construction Work in Progress Method (CWIP), used by the PSC since 1948, allows a utility to include the funds invested in plant under construction in the rate base. Investors thus earn a return on these funds before the plant goes into service. In Formal Case No. 685 the Commission adopted an Allowance for Funds Used During Construction treatment (AFUDC), which capitalizes interest on funds so invested and excludes them from the rate base until the plant is operational. Ratepayers therefore pay no return on these funds until the plant begins to operate.

■ We affirm this aspect of the order, finding that the Commission acted within the scope of its authority and adequately explained the basis for its decision.

In *Goodman v. Public Service Commission*, 162 U.S.App.D.C. 74, 497 F.2d 661 (1974), the court reviewed a ratepayer's challenge to a PSC order that included CWIP in the rate base. The court affirmed the Commission's order but acknowledged that several accounting methods for handling funds invested in plant construction have met with regulatory and judicial approval. *Id.* at 80, 497 F.2d at 667. "While appellant's proposed capitalization of interest and exclusion of plant under construction would no doubt be an acceptable alternative . . . we accord the Commission the right to choose between the two." *Id.* at 82, 497 F.2d at 669 (citation omitted).

■ It is the Public Service Commission, not this court, that must determine which of these two acceptable accounting methods should be adopted in the best interest of the public. The Commission is not bound by a single regulatory formula, *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942) and may modify policy choices so long as it explains the basis for the change. "An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . ." *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (footnotes omitted).

In Formal Case No. 685 the Commission changed its practice of including plant construction costs in the rate base after conducting precisely this type of reasoned analysis. The Commission reviewed the history of its accounting treatment of these funds

---

**2.** The Commission rejected several proffers of evidence made by Pepco after the close of the record. Post-test year data was accepted only for the limited purpose of determining the effects of attrition, and a wage adjustment and supplemental People's Counsel assessment were completely excluded.

and concluded that the circumstances that initially justified the inclusion of CWIP in the rate base had changed enough to merit adoption of AFUDC treatment. The Commission concluded that while the arguments of the parties concerning cost signals, capital cost effects, and economization incentives were inconclusive, the policy change was justified in light of the reduction in Pepco's construction program needs. The decision reflects a policy judgment that present customers should not pay for facilities that will be used to provide service to future customers, a judgment we find within the informed discretion of the Commission to make.

### III.

Pepco argues that the Commission acted arbitrarily in setting the rate of return on common stock equity at 12.75% in view of record evidence of the Company's financial plight and the general state of the economy.

The Supreme Court discussed standards for reviewing a challenged rate of return in *Bluefield Waterworks and Improvement Co. v. Public Service Commission*, 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–679, 67 L.Ed. 1176 (1923):

> What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties .... The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise money necessary for the proper discharge of its public duties.

Determination of an appropriate rate of return is, thus, a question of informed and expert agency judgment. Moreover, in evaluating evidence introduced to assist in this determination "[t]he Commission properly may give more credence to certain evidence than it does to other evidence which it deems less reliable." *Washington Gas Light Co., supra* at 1213. We find that the Commission based its choice on a 12.75% rate of return on substantial evidence introduced by the parties concerning the rate needed to ensure financial soundness and attract capital and therefore affirm this aspect of the order.

The record indicates that the Commission heard testimony from various witnesses concerning the appropriate rate of return on Pepco's common stock equity. Estimates offered varied according to assumptions and methods used and ranged from 11.75% to 14.5%. Most estimates were within the 12–13% range with the exception of Pepco's.

The Commission evaluated the analysis of each witness and specifically critiqued flaws it perceived in Pepco's analysis. In concluding that 12.75% was an appropriate rate the Commission primarily relied on the analysis and conclusions of staff witness Kosh but was careful to adjust his recommendations to account for regulatory lag and changed economic conditions.

> As this order is being issued a year after the testimony was presented in this case and given the change in CWIP policy and the resulting effect on cash flow, it now appears reasonable that a stock issuance may very well occur during the period that these rates will be in effect.... [I]n accordance with Mr. Kosh's testimony, we believe that his "bare bones" return recommendation should be increased to accommodate probability of issuance of stock and the economic conditions. [Order No. 6096 at 28.]

In short, the record shows that the Public Service Commission considered various evidence introduced by the parties on the ques-

tion of the level of return needed to safeguard financial soundness and attract capital and reached a conclusion based on its expert and critical evaluation of the evidence. We are, therefore, satisfied on this record that substantial evidence supports a 12.75% rate of return.

## IV.

People's Counsel challenges the method used by the Commission to compute the amount of cash working capital allowance which may properly be included in the rate base.

"Cash-working capital represents an amount which the company (investors) must supply from its *own funds* for the purpose of enabling it to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues." *People's Counsel v. Public Service Commission, supra* at 46 (citation omitted). To the extent that investors supply these funds they are entitled to a return on their investment, which is accomplished by including a cash working capital allowance in the rate base. *Id.*

Pepco pays interest and dividends to its investors and creditors periodically; pending the periodic disbursements of these funds, revenue earmarked for these purposes accrues in company accounts.

The Commission refused to consider accrued interest and dividend funds in computing the amount of cash working capital to be included in the rate base in the instant case. People's Counsel argues that because these funds are supplied by the ratepayers and constitute cash available for expenses until dividends are declared or interest payments due, cash working capital should be reduced to the extent that these funds are available.

We reviewed similar claims by this petitioner in *People's Counsel v. Public Service Commission, supra.*[3] Therein we quoted

with approval the opinion of the Iowa State Commerce Commission in *Re Iowa Power and Light Co.,* 6 P.U.R.4th 446 (1974). The Iowa Commission had analyzed the very issue before this court and found that accrued interest should be offset against the cash working capital allowance. In contrast to this well-reasoned opinion the PSC offered a conclusory statement that the matter was discretionary to support its contrary finding. *People's Counsel, supra* at 50. While we found the Iowa Commission's approach appealing, we did not order the PSC to adopt it. Rather, we "[directed] the Commission's attention to the Iowa commission's opinion . . . for its serious consideration in formulating the rate base in future proceedings." *Id.* at 50.

We find that the Commission did precisely this in Formal Case No. 685. The orders include a review of the Iowa decision and an explanation of the rationale for the decision to reject this approach and exclude accrued interest from cash working capital calculations. The Commission distinguished the interest accruals as "capital" expenses and therefore excluded them from rate base calculations since it considers only operating expenses in calculating cash working capital.

■ The Commission's treatment of accrued interest is not unique. *See People's Counsel v. Public Service Commission, supra* at 49 (citing *Re Florida Gas Transmission Co.,* 93 P.U.R.3d 477 (1972)); *Re Narragansett Electric Co.,* 1 P.U.R.4th 60 (1973); *Rhode Island Consumers' Council v. Smith,* 113 R.I. 384, 322 A.2d 17 (1974). We are satisfied that the PSC complied with our mandate and did not abuse its discretion in rejecting the Iowa Commission's approach. Rather, it adopted an alternative treatment of this matter on a reasoned basis. People's Counsel presents a plausible alternative but has failed to meet the burden of demonstrating arbitrary and capricious action on the part of the Commission. It is not our

---

**3.** Most recently we have reviewed this claim in *Washington Gas Light Co. v. Public Service*

*Comm'n,* D.C.App., 452 A.2d 375 (1982).

function on appeal to substitute our policy preferences for those of the Commission when the Commission's choice is rational and substantiated with adequate evidence.

## V.

In 1970 Pepco decided to construct a nuclear power plant at Douglas Point, Maryland and subsequently expended sums for site certification, construction, and the purchase of nuclear fuel rights. When Pepco terminated this project in 1977 a net profit resulted, largely because the Company was able to sell its nuclear fuel rights. Pepco challenges the Commission's accounting treatment of this credit in Formal Case No. 685.

The Commission accepted Pepco's proposal to amortize the net credit over a ten year period as an offset to operating expenses (thus benefitting ratepayers), but decided to deduct the unamortized credit from the Company's rate base on the ground that these funds are not investor-supplied capital, reasoning that investors therefore are not entitled to earn a return on them.

The parties agree that exclusion of the unamortized credit from the rate base will divert the entire financial benefit from termination of Douglas Point to the consumer, while inclusion would divide the benefits among consumers and investors. The question for review is whether the Commission improperly directed all benefits from the Douglas Point termination to Pepco's consumers.

Pepco contends that the unamortized net credit should be included in the rate base because investor funds purchased the fuel rights and Company management was responsible for negotiating the contract clause that allowed resale at a high profit. Pepco also argues that Douglas Point proceeds were used to redeem high cost preferred stock, thus reducing the Company's cost of capital, and that the consumer will adequately benefit from this redemption and the amortization of the credit. The Commission rejected these arguments, finding that the stock redemption was an inde-

pendent transaction and that, because the net credit was not investor-supplied capital, there was no reason to allow investors to earn a return on these funds. On these grounds the entire benefit of the Douglas Point termination was allocated to Pepco's consumers.

The appropriate allocation of gains and losses realized upon the transfer of utility property is an issue that has received surprisingly little attention in reviewing courts. Those few courts that have addressed the subject have provided only general guiding principles by which to judge the propriety of a commission's action in such matters. It is evident, however, that each case must rest upon its own factual situation; the validity of each allocation of profits or losses depends upon the nature of the property transferred and balancing of the equities involved.

... The ... important inquiry in determining who should receive the gains ... is the question of who has borne the risks and burdens associated with ... maintenance [of the property in question]. [*Washington Gas Light Co., supra* at 1237–1238 (citations omitted).]

Because the Commission is vested with discretion to balance the interests of consumers and investors, it is essential that the exercise of this discretion be fully explained. In *Washington Public Interest Organization v. Public Service Commission*, D.C.App., 393 A.2d 71 (1978), this court criticized the Commission's reliance on nothing more than the FPC Uniform System of Accounts to justify allocation of gains realized from the sale of land retired from service, finding that

[t]he Commission ... has not advanced affirmative, particularized reasons justifying its treatment of the capital gains on land. Unless and until the Commission does so, reflecting attention to the consumer as well as investor interest, we cannot say that the ... rates at issue here have been established on the basis of "reliable, probative, and substantial evi-

dence." [393 A.2d at 93 (citation omitted).]

The Commission's finding in Formal Case No. 685 that the proceeds from termination of the Douglas Point facility are not investor-supplied capital is insufficient to support the decision to allocate the entire gain from this transaction to the consumer. The order fails to explicitly weigh the interests of the consumer and investor; it focuses only on the failure of the company to establish a right on the part of its investors to earn a return on the unamortized credit. The PSC must examine the equities at issue more fully and explain not only why investors should receive no benefit but, also, why consumers should receive the full benefit of this transaction. *Compare Washington Gas Light Co., supra* (affirming Commission's decision to allocate gains from sale of propane gas reserves on grounds that propane inventory was included in the utility's rate base, and ratepayers paid storage costs and bore some of the risk of loss through catastrophe, although investor funds were used to purchase the propane); *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 446 A.2d 28 (1982) (affirming Commission decision to allocate gains from land sales to investors where Commission supplied reasoned analysis in support of its decision).

We therefore remand this matter for further Commission proceedings pursuant to our authority under D.C.Code 1973, § 43–705. We direct the Commission to issue supplementary findings and conclusions based on the record already developed as well as supplemental evidence the agency may in its discretion wish to receive on this issue. After the parties have had an opportunity to comment on the supplemental findings and conclusions the record shall be filed with this court. When the parties have filed briefs this court shall either proceed directly to a decision or set the matter for hearing.

In remanding we emphasize that we have not ruled on the merits of petitioner Pepco's challenge to this aspect of the Commission's order in Formal Case No. 685. Rather, we find that the Commission's Opinion and Order does not sufficiently articulate its rationale to enable this court to evaluate the merits of each party's position on appeal. We quote the opinion of the court in *Washington Public Interest Organization v. Public Service Commission, supra* at 1223.

The petitioners for judicial review have carried their burden to the extent of convincing the court that their position is not frivolous—they may have a valid point— and that the agency has not marshalled substantial evidence in support of its decision; but they have not carried their ultimate burden of convincing the court that the agency action cannot be supported.

*Affirmed in part, and remanded for proceedings not inconsistent with this opinion.*

NEBEKER, Associate Judge, dissenting:

The shortsighted and cryptic review of the Public Service Commission's determination to alter its long-established accounting treatment of funds invested in plant projects under construction (CWIP) cannot, in my view, be permitted. Therefore, I respectfully dissent.

For purposes of brevity, I will not accost the reader with any further rendition of the facts or the tortured procedural posture of this case. My sole concern is to highlight the nature of our mistake in abandoning so cavalierly our responsibility to review a major revision in the Commission's accounting policy. I cannot in any way rationalize into the realm of discretionary prerogative the Commission's decision. There simply is not the "reasoned decision-making" which we require when evaluating a change in Commission policy. *See Consolidated Gas Supply Corporation v. F.P.C.,* 172 U.S.App.D.C. 162, 171, 520 F.2d 1176, 1185 (1975).

The nub of the Commission's decision is the rejection of an established accounting procedure whereby funds invested in construction work in progress are included in

the rate base permitting a direct return to investors as the funds are invested. This long standing practice by the Commission was adopted in Formal Case No. 373 (Order No. 3317, Feb. 20, 1948):

> The change proposed will allow a direct return currently as the funds are invested in electric plant destined for use in the service of the public. *The Commission finds that the proposed change is equitable and proper.* [*Id.* (emphasis added).]

Now, seemingly by regulatory fiat, the Commission has chosen to abandon a 30-year policy and to direct Pepco, instead, to capitalize on an allowance for funds used during construction (AFUDC) to compensate it for use of those same funds. This policy switch is not inconsequential. In fact, CWIP accounts for 16 percent of Pepco's rate base systemwide. *See* Formal case No. 685 (Order No. 6096, June 14, 1979) at 40. I therefore, cannot, like the majority, defer to Commission analysis of the reasons for the change.[1]

"The rule of law does not forbid an agency [to] modify its regulatory policy . . . ." *City of Chicago v. F.P.C.,* 128 U.S.App.D.C. 107, 115, 385 F.2d 629, 637 (1967), *cert. denied sub nom. Public Service Commission v. F.P.C.,* 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968). In fact, "within the limits imposed by the requirement of reasoned decision-making, the Commission is free to modify or even reverse its established policy." *Consolidated Gas Supply Corporation v. F.P.C., supra* at 171, 520 F.2d at 1185. "[T]he Commission is 'free within the ambit of [its] statutory authority to make the pragmatic adjustments which may be called for by particular circumstances.'" *Id.* (quoting *F.P.C. v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)). However, the discretion to alter policy does not carry with

it unbridled authority to do so on whim. "[T]he rule of law requires not only that the new standards 'flow rationally from findings that are reasonable inferences from substantial evidence,' but that 'the agency give due consideration to the equities, if any, arising out of commitments based on previous rulings.'" *Consolidated Gas Supply Corporation v. F.P.C., supra,* 172 U.S. App.D.C. at 173, 520 F.2d at 1187 (quoting *City of Chicago v. F.P.C., supra,* 128 U.S. App.D.C. at 115, 385 F.2d at 637). Ultimately, the Commission decision must fail under either of these tests.

Succinctly, the Commission proposes to support its decision by the disarming conclusion that "as a matter of policy, present customers should not pay for facilities that will be used to provide service for future customers." Formal Case No. 685, *supra* at 52. The change in accounting methods will purportedly rectify this inequity. I, however, cannot find in this bald platitude either the reasoned analysis or substantial evidence that we, as a reviewing court, must require in support of such a policy change. In vain, I search the Commission's decision for further basis upon which to support their policy shift. Simply, there is none.

Furthering the evidentiary inadequacy of the Commission's decision is an apparent gross insensitivity to the accrued equities (including necessarily the full retroactive effect on the utility and its investors— something avoided if traditional rule-making procedures are followed) arising out of previous rulings. I recognize that the Commission has proposed to "phase in" the AFUDC accounting method, but this does not fairly address the *fact* that the net effect of 30 years under the CWIP accounting method has produced utility rates well

---

1. I am not unmindful that on several occasions previous to the Commission ruling at issue, the Commission has asserted, in effect, that the use of the CWIP accounting method in place of AFUDC was a choice between two acceptable alternatives. *See* Formal Case No. 438, *In re Potomac Electric Power Company,* 8 PUR 3d (1955); Formal Case No. 464 (Order No. 4525, April 10, 1973); *In re Potomac Electric Power Company,* 3 PUR 4th 65 (1974); Formal Case No. 630 (Order No. 5739, Nov. 12, 1975), 11 PUR 4th 215. *See also Goodman v. P.S.C.,* 162 U.S.App.D.C. 74, 497 F.2d 661 (1974). However, preserving the right to change its mind does not allow the Commission to dispense with supporting their decision to do so.

below the average for the industrialized northeast. It does not address concerns about continued investor confidence. The Commission has seemingly abdicated its responsibility to fairly assess the true impact of this accounting policy change. Nowhere does the Commission address itself to how legitimate concerns may be allayed.

The majority's "hear no evil, see no evil" approach to appellate review of this matter is disheartening. "The reviewing court's duty to 'assure fidelity to the functions assigned to the regulatory agency by congress' requires that it hold the agency to its duty to give reasoned consideration to the facts and issues material to its determinations." *Public Service Commission, State of New York v. F.P.C.,* 167 U.S.App.D.C. 100, 107, 511 F.2d 338, 354 (1975) (quoting *Public Service Commission v. F.P.C.,* 159 U.S.App. D.C. 172, 208-09, 487 F.2d 1043, 1079-80 (1973), *vacated and remanded sub nom. Shell Oil Co. v. Public Service Commission,* 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974)). "Courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of non-regulation in agency trappings." *Id.* at 292, 511 F.2d at 354 (quoting *Public Service Commission v. F.P.C., supra,* 159 U.S.App.D.C. at 208-09, 487 F.2d at 1079-80). I am afraid that this is precisely what the majority has done.

In conclusion, I note that it is not for this court to substitute its opinion for that of the Commission. The plain fact, however, is that the Commission has not as yet reached a decision which is supported by substantial evidence. The Commission has avoided its statutory duty and we have ignored ours. I commend to all the dissenting opinion of Commissioner Straton, Formal Case No. 685 (Order No. 7000, July 18, 1979) at 28, wherein he states aptly that "The Commission has dealt with the CWIP issue as if there were no yesterday and no tomorrow. Thus, a legacy will be squandered and a future mortgaged. I can think of no worse public policy." *Id.* I dissent and would therefore vacate the Commission's decision and remand with directions

to exclude this change in accounting methods from the rate setting calculus until such time as further hearings may shed factual light on such a draconian and retrospective step.